IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 17, 2021 Session

## STATE OF TENNESSEE v. KELLY BROOKE FRYE

**Appeal from the Criminal Court for Sullivan County**
**No. S66035     William K. Rogers, Judge[1]**

_____

### No. E2019-00686-CCA-R3-CD
_____

Aggrieved of her Sullivan County Criminal Court jury conviction of making a false report, *see* T.C.A. § 39-16-502, the defendant, Kelly Brooke Frye, appeals. The defendant challenges the sufficiency of the convicting evidence and the propriety of the sentence originally imposed as well as the trial court's denial of her motion, filed pursuant to Tennessee Rule of Criminal Procedure 35, to reduce her sentence. She also alleges that she was deprived of her constitutional rights to a public trial, to trial by an impartial jury, and to the effective assistance of counsel at trial. Discerning no error, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Melissa G. Owens, Kingsport, Tennessee (on appeal), Samuel E. White, Kingsport, Tennessee (at sentencing), and Joseph A. Fanduzz, Knoxville, Tennessee (at trial), for the appellant, Kelly Brooke Frye.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Julie R. Canter, J. Lewis Combs, and Andrea Black, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

---

[1] The Honorable R. Jerry Beck presided over this case until his retirement.

The Sullivan County Grand Jury charged the defendant, her mother, Rebecca Arrington, and her husband, Andy Frye, via presentment with one count of making a false report.

The defendant and her husband were tried jointly on February 21 and 22, 2018.[2] At trial, Kingsport Police Department ("KPD") Officer George Horne testified that on August 13, 2015, he was called "off the road" at approximately 5:00 p.m. to "take a walk-in report" from the defendant and her husband. Officer Horne explained that a walk-in report is, as the name suggests, when "[s]omebody comes into our justice center or the police department and asks to speak to an officer." On this occasion, the defendant and her husband complained that a Sullivan County Sheriff's Office ("SCSO") deputy had assaulted the defendant. The defendant "alleged that the deputy had tried to serve some kind of papers on her and had grabbed her and threw her down the stairs." She told Officer Horne that she had sustained bruises to her arm and her neck. Officer Horne testified that Mr. Frye provided the "[s]ame story." Officer Horne said that the defendant appeared "disheveled" but that he did not see any visible marks or bruises as she had claimed. Because he saw no visible injuries, Officer Horne did not take any photographs.

During cross-examination, Officer Horne said that he was the only KPD officer present during the taking of the report, which occurred "[o]utside our records department" but that an officer of the SCSO was in the area working as "security." That officer played no role in the taking of the defendant's report. Officer Horne said that he did not record the taking of the report and did not take contemporaneous notes. He testified that the entire interaction took between five and 10 minutes. Officer Horne agreed that the defendant told him that the deputy had placed his hands on her in the stairwell of the Kingsport Justice Center and that he pushed her down the stairs and then forced her back up the stairs.

During redirect-examination, Officer Horne recalled that the defendant claimed that the deputy grabbed her by the arm, pushed her down, grabbed her neck, and then held her on the ground.

SCSO Deputy Alan Hill testified that on August 13, 2015, he was working security at the Kingsport Justice Center when he heard a commotion "in the clerk's office." He said that he "had stepped in the front lobby once to see if everything was okay, but at the time the [KPD] was dealing with the situation in the clerk's office." Deputy Hill "returned to my security post" at the "tail end" of the metal detector. He recalled that the defendant and Mr. Frye "were being very loud on the inside" and that "[t]hey were

---

[2]     Ms. Arrington was not arrested until the first day of the joint trial when the prosecutor recognized her in the gallery.

-2-

videotaping the interaction, whatever was going on inside." When the defendant and Mr. Frye "exited the lobby outside to . . . where the security post is, they . . . set up station or staged their self out front. They were videotaping the front security, making comments." He said that Mr. Frye "had made a comment towards me about giving me literature and it would change my mind towards my job." Both Fryes "were making comments to the people coming through the front lobby, that they were the news; 'We're the news now.'" Deputy Hill said that he had "never encountered that before." He described the Fryes as "obnoxious, like they were trying to control the situation or to basically conform the situation to what they needed." Deputy Hill said that he "tried to tune it out." He recalled that Mr. Frye approached him on "one or two occasions" and that Mr. Frye complied when Deputy Hill "asked him politely to please step back, do not interfere with my duties at the post."

Deputy Hill testified that the Fryes eventually left the building but returned "later in the evening" with Ms. Arrington, "entered the front lobby, went through the metal detectors and everything." The Fryes "went to the second floor, and Ms. Arrington stayed down videotaping the front lobby once again . . . . She made some statements, but I have no clue what she said." A short time later, another "couple came in," went "through the metal detector, looked at Ms. Arrington, and said, 'You're next.'" Deputy Hill found out later that the couple "was family members" of the Fryes. At that point, Deputy Hill became concerned that "something was about to happen upstairs," so he went upstairs to make sure that a fight did not break out between the couple and the Fryes.

When Deputy Hill got to the second floor, he heard "what seemed to be arguing in the background" and assumed that "it was between the Fryes and the other couple that was there." When he entered the clerk's office, he saw the Fryes "towards the front" and the other couple "towards the back of the clerk's office." He then heard Mr. Frye ask "a question in a very loud manner towards" an employee of the clerk's office. He said that, at that point, his primary concern became "trying to keep them from meeting in the middle, basically to keep the two groups separated." Deputy Hill testified that he "had no clue still yet what was going on" but was concerned that "it was possibly a domestic situation." He said that he was primarily concerned that "the other couple was going to do something with" the Fryes. At that point, "[o]ne of the clerks had approached, said something about paperwork," so Deputy Hill tried to calm the Fryes and "talk them back out of the building."

Deputy Hill testified that the Fryes eventually calmed down and "were asking questions that, because I did not know what occurred, I had no answers to." He recalled that the Fryes "were talking about family members, family members getting upset, something [like] that, which everyone goes through that." One of the Fryes pushed the button to call the elevator and "were, in my interpretation, leaving." At that point, "the

-3-

other couple had come out" and "had made a derogatory comment towards the Fryes. I don't know which one. And the incident escalated." He said, "At that point it was what you would consider crazy." He said that the defendant looked at him and commented, "'How did they get away with that?'" Deputy Hill testified that he "knew there was still paperwork coming; but still yet, at that time I was more concerned about violence [than] anything at that time." He said that he attempted to delay the Fryes because his "biggest fear was if it makes it to the parking lot, what happens then? What's in their vehicles? What happens? Who will be assaulted?"

Deputy Hill testified that the defendant's demeanor changed immediately when one of "the clerks stepped out" and she "made a comment, 'You're not serving me with any papers.'" He recalled that he asked the defendant "to just stay right there" because he was trying to give the other couple time to exit the building. He explained that, by that time, the other couple had gone down to the first floor but had not yet had time to get out of the building. For that reason, he endeavored to keep the Fryes on the second floor, but "they just went crazy." Deputy Hill said that the Fryes "wouldn't conform to anything" and that "there was no reasoning with them." "At that point, [the defendant] started walking extremely fast towards the lobby" while Mr. Frye and Ms. Arrington "was staying there. It was all keying off of [the defendant's] actions." The defendant "started towards the stairway, and [Deputy Hill] asked her several times to stop" because he was worried that the other couple had not yet exited the building.

Deputy Hill entered the stairwell just behind the defendant, and, when he caught up to her, he asked her to go back to the second floor. The defendant refused. Deputy Hill recalled that both Mr. Frye and Ms. Arrington were yelling but that the defendant "was just beyond unreasonable." Deputy Frye said that he placed his left hand on the defendant's left arm in "an escort position" to try "to get them back upstairs." He explained that he chose to use the escort position because "[i]t's more of a way to just control the situation." He recalled that the defendant "tried to turn" at "the top of the stairs" and continually yelled, "'Let go of me.'" When they got through the door to the second floor, "Mr. Frye started hollering, 'Stop pulling her hair. Stop pulling her hair.'" A short distance from the stairwell door, the defendant "flung herself" "up again[st] the wall and slid down the wall." He recalled, "From the time she went down the hall, Mr. Frye and Ms. Arrington was hollering, 'He's pulling her hair. Help. Help. Help. Leave my wife alone.'" The defendant, too, was yelling, but Deputy Hill could not discern what she was saying over Mr. Frye. Deputy Hill said that he "never raised my voice other than a command, maybe, in the stairwell. But that was about it." He insisted that he "could not understand . . . at the time why" Mr. Frye was yelling at him, saying, "[A]fter 15 years, I've never run across something like that."

Deputy Hill adamantly denied having pushed the defendant to the floor. He acknowledged that he "rested my arm on her shoulder" after she "flung" herself to the floor but denied that he held her on the floor. He maintained that he did not, at any point, grab her by the neck or pull her hair. Deputy Hill said that there were no cameras in the area where the incident took place.

Deputy Hill testified that, after the defendant made the complaint against him, he "was relieved of duty [and] placed on leave while an investigation was pending." He also faced a criminal investigation by the KPD and an investigation by the SCSO Internal Affairs Division. Both investigations cleared Deputy Hill "of all wrongdoing."

During cross-examination, Deputy Hill acknowledged that he knew that there was some civil paperwork to be served but said that "what it was and who it was on, I did not know." He adamantly denied asking the defendant to step into the clerk's office to be served. He also denied that his purpose in asking the defendant to remain in the hallway was so that the papers could be served. He explained, "I actually was trying to get them out of the building before the other couple come out." He said that the defendant's potentially avoiding the service of process "was in the back of my thoughts" but insisted that he "was more concerned about what might transpire downstairs or in the parking lot" because he was worried that "an assault was going to take place." Deputy Hill maintained that he brought the defendant back up the stairs not to receive service of process but to diffuse the situation by "trying to separate the parties. I would have done no different if it had been the other couple." He acknowledged that he allowed the Fryes to leave just after another officer served the defendant with process, noting that, by that time, the other couple had had ample time to leave the building and the parking lot.

Deputy Hill acknowledged that, in his written statement just after the incident, he wrote that he asked the defendant to remain in the hallway until the papers had been served and that the Fryes had attempted to evade service of process. He agreed that the defendant did not want to go back up to the second floor after she had started down the stairs but denied that he pushed her up the stairs, saying, "It's more of a directing." He said that the defendant "complied all the way to the top. She yelled, she screamed[,] the whole nine yards. But it was mostly a compliance." Deputy Hill agreed that the defendant had not committed any crime and reiterated that he detained her because he was trying "to diffuse the situation and separate the two parties." He said that the defendant flopped to the floor because she did not want to go any further. Deputy Hill added, "I asked her several times to please come back upstairs. I was nothing more than polite to both of them the whole time."

During redirect examination, Deputy Hill indicated that the Fryes' being disruptive earlier in the day contributed to his concern that the situation could turn volatile

if he did not separate them from the other couple. He said that he elected not to arrest them for disorderly conduct, despite his belief that their conduct fit the definition of that offense, because his "concern was diffusing the situation" and "separating the parties." He described the defendant's going to the floor as "a fling . . . and [she] slid down the wall. At that point in time, my arm rested on her left shoulder, or my hand." He said that at the time, he thought, "'Why is this happening? Where did it get to this point?' Because 15 years, I've never seen anything like this. I have . . . never encountered individuals that was so willing to make everything around them conform to them and them only." He insisted that the commands he gave the Fryes were "more for the safety of them and the building."

Charlene Creamer, an employee of the City of Kingsport Information Technology Department, testified that, as she was leaving her office on the second floor of the justice center on August 13, 2015, she heard "a lot of commotion or loud noises, loud voices" in the lobby area outside of the clerk's office. She observed a SCSO officer, whom she described as "the security guard that usually is downstairs," with "his hand behind this woman in a herding manner as if you were guiding someone in a direction." She said that it appeared as though the officer was "trying to move" the people "out of the building at that time of day." Ms. Creamer recalled that the people "were loud, and he was very cooperative with them in trying to work with them and tell them to exit the building." The people "went to the stairwell with him" and entered the stairwell. "And then the door immediately opened again and the same group of people with the same officer came back into the lobby area, and they were still loud." Ms. Creamer could not discern most of what the people were saying. She said that the officer still "had his hand behind the woman and did not touch her" but "was guiding, as in a herding motion." "And then immediately I saw the woman sort of fall back and land against the wall as if she had thrown herself backwards. And then she slid down the wall." Ms. Creamer testified that the officer looked at the woman but did not touch her while "the gentleman that was with . . . her started yelling very loud. And I did hear him say, 'I need a supervisor. This officer [pushed] my wife.'" The man also yelled, "'He's pulling her hair. He's pushed her down.'"

Ms. Creamer testified that the behavior of the man and woman made her uncomfortable, so she returned to her office until they left. She maintained that the officer did not hit or push the woman, did not hold her on the floor, and did not pull her hair. She said that the officer "was being as polite as he could."

James Barry Allison, another employee of the City of Kingsport Information Technology Department, testified that he was walking out with Ms. Creamer "at the end of the day" on August 13, 2015, "when we observed the situation." He said that he and Ms. Creamer initially opened the door when they heard someone "shouting quite loudly" in the usually quiet area. He saw "about three individuals" who "had walked probably from the county side into the lobby area," and the "county officer--who I knew as Alan-- was trying

-6-

to convince them to leave." Mr. Allison said that the people "seemed to be resisting, and they were rather loud." He recalled that the deputy "[t]ouched the lady on her left shoulder" in "sort of a guiding motion." At that point, "the gentleman started saying, 'We need a supervisor.' I remember that very specifically." "And the lady sort of dropped to the floor at that point."

Mr. Allison testified that "other officers came in right after that." He and Ms. Creamer shut the door because "it was an odd situation to see happening." Mr. Allison said that the deputy "certainly was not angry. He just seemed to be an officer in the process of doing his job." He said that the deputy did not push the woman down, did not grab her neck, and did not pull her hair at any point.

SCSO Lieutenant Jeremiah Lane, who worked in the Internal Affairs Division, testified that he initiated "a 'code of conduct' and 'use of force' investigation" after he received a complaint against Deputy Hill in August of 2015. He said that the code of conduct allegation "was the bringing of shame or embarrassment upon the . . . sheriff's office." The use of force allegation related to Deputy Hill's treatment of the defendant at the Kingsport Justice Center. Lieutenant Lane said that he spent approximately 40 hours investigating the allegations and that he eventually determined that "[t]he complaint was unfounded."

KPD Sergeant Randy Murray testified that in August 2015 he worked as a corporal in the Criminal Investigation Division "over [the] Persons Crimes Unit." He received the defendant's complaint against Deputy Hill on August 14, 2015. Sergeant Murray investigated, and, at the conclusion of his investigation, a decision was made not to formally charge Deputy Hill with assaulting the defendant.

During cross-examination, Sergeant Murray testified that he interviewed several witnesses, including Mr. Allison and Ms. Creamer. He recalled that he telephoned the Fryes at the number they provided on August 14, 2015, and spoke "with an adult male" who had no information about the complaint. He said that he left his contact information for the defendant and that she returned his call on August 17, 2015. During that call, they "made arrangements to try to have her come down to provide a statement of facts" that same day. The defendant called him back later to reschedule for August 21, but he "never did receive word back from her." Sergeant Murray testified that he learned "through the internal investigation" by the SCSO that Mr. Frye "advised that he may seek an attorney." He said that he found the Fryes behavior unusual, noting that victims were typically cooperative during an investigation because "we're going to try to assist you the best we can."

Sergeant Murray testified that the defendant was charged with making a false report after the completion of the investigation into her complaint against Deputy Hill. Sergeant Murray said that Deputy Hill "stated that he never did do what was alleged in the report of an assault that took place of throwing someone against a wall or someone throwing down to the . . . ground." Sergeant Murray conceded that Deputy Hill said in his statement that he had placed his hand on the defendant to guide her and that she did not want to cooperate.

The State rested, and, following a full *Momon* colloquy, Mr. Frye elected not to testify.

The defendant testified that on August 13, 2015, she went to the Kingsport Justice Center "[e]arly in the morning" to "file charges" against "trespassers on our property." She said that they went to the Kingsport Justice Center to "hand over that report with the video of the trespassers on our property." The defendant said that "[t]hey sent us to Blountville. They said we were at the wrong place." The defendant and Mr. Frye returned to the justice center later that afternoon, and, while there, they encountered some of their family members. The defendant, who was upstairs in the clerk's office, said that she did not know what had happened on the first floor. The defendant testified that she met Deputy Hill "about the same time" "the relatives had walked into the clerk's office." She said that she "walked out" of the clerk's office because "we weren't getting anywhere." She added that she "didn't want to be in the same room with these people" because "they're not nice people."

The defendant testified that as she began to leave the clerk's office, she saw Deputy Hill standing outside the clerk's office with Ms. Arrington. The defendant acknowledged that the clerk had asked her "to come back and wait for papers" and that she waited "[t]hree to five minutes or something like that." She said that, despite having been asked specifically to wait, she left when she could not get any answers to her questions. She claimed that a KPD officer inside the clerk's office had told her that she could leave. The defendant recalled that as she "was walking towards the stairwell to leave," she "heard people behind me, but I didn't know who it was." According to the defendant, as she began to walk down the stairs, she heard Deputy Hill "running down the stairs." She insisted that Deputy Hill did not ask her to stop but instead "[r]an down the stairs and grabbed me." She maintained that he forcefully turned her around and forced her back up the stairs against her will. The defendant claimed that Deputy Hill "grabbed my arms in a very uncomfortable position" behind her back and that "he pulled my arms around and he threw me around." She said that they "were still on the stairs at that time when he grabbed me and threw me around." She testified that Deputy Hill "had his hand on my neck and my arm pushing me" up the stairs.

-8-

The defendant testified that Deputy Hill "threw me so hard around, I lost my balance and went to the ground." She added, "[H]e grabbed me and threw me." The defendant insisted that she was trying to cooperate with Deputy Hill, saying,

> I wasn't trying to go the opposite way. I was actually trying to go the direction he was telling me to go because, I mean, at that point he had done manhandled me, and I didn't know what he was wanting me to go or what he--I didn't know what he was doing.

The defendant admitted that she went to the floor on purpose when they reached the lobby on the second floor because she "had no idea where he was taking me." She explained, "I said, 'I'm not going anywhere,' and I sat down . . . in the center of the floor in front of the elevator in the lobby." She said that Deputy Hill "had his hand on my neck" gripping her "hair braid and my neck, and he was holding my arm, and I was sitting on the ground." She insisted that she remained on the floor for "three to five minutes" until some other officers "came out and asked [Deputy] Hill what he was doing. He said they had papers." The defendant claimed that, at that point, one of the officers "asked, 'Who's Kelly?' They threw them on the ground. They didn't give them to me, they threw them on the ground in front of me." She left immediately after receiving the papers.

The defendant testified that she and Mr. Frye then went directly to the KPD "[t]o file a report for assault." She said that she believed that Deputy Hill had assaulted her. She claimed that she made her report to a Sergeant Cradic and that Officer Horne "walked out for, like, the first two-and-a-half minutes of me giving my report, and then walked back in." The defendant said that, after she scheduled a meeting with the officer investigating her assault complaint, "officer presence increased dramatically in my neighborhood." She also claimed that she "noticed heavy police presence driving by my house, following me to the grocery store for 15 to 20 minutes at a time and not pulling us over, just following us." She testified that, at that point, she told the police that she wanted to speak with an attorney and did not want to have any further interaction with the police.

During cross-examination, the defendant acknowledged that when she returned to the justice center after having been incorrectly sent to Blountville, she was agitated and "was ready to leave for the day." She admitted that she "may have asked a couple questions" while going through the security check point, explaining,

> I'm a photographer and videographer. And they, at the time, we -- if we took any kind of, like, a cell phone in or a camera or anything like that, they would immediately say, "You can't have that, and to take it back out to your car."

So we asked, "Are we allowed to have that?"

They said, "No."

She insisted that neither she nor her husband did any video recording that day. She said that she always carried an audio recorder on her person "[f]or business purposes; life. I mean, I just record everything I do." She added, "I mean, it's saved me a hundred times talking to telemarketers and things on the phone. . . . I record it for . . . my personal life and business purposes." She said she kept those recordings "for my records" "[j]ust as long as I needed them."

The defendant characterized her arriving at the justice center at the same time as the relatives that she did not like as "an extreme coincidence." She testified that she "was in the clerk's office first" and that "[w]hen they entered the clerk's office, they were making faces towards us and smug comments under their breath . . . about my weight or my height and . . . things like that. And so . . . we did bicker a little bit." The defendant said that she was "naturally a loud person" and admitted that she did "swear sometimes when I get upset." She denied that anyone at either the security checkpoint or in the clerk's office had asked her to keep her voice down. She insisted that she left the clerk's office "because we had done . . . been to both places and we weren't getting anywhere. We just -- we were done for the day and we were going home."

The defendant testified that when she walked out of the clerk's office, she saw Deputy Hill, who "said that the people that were in the clerk's office had said something to them on the bottom floor before they came up, and that's why [he] was there." She recalled that Deputy Hill "said, you know, 'They . . . had made some very rude comments, and I came up here to make sure that everything was okay.'" She said that she did not "remember my relatives ever coming out of the office and making a statement or saying anything outside of that office." The defendant claimed that she went back into the clerk's office at the behest of one of the clerks and that her relatives, who were still in the clerk's office, "were making their smug comments" and "we would respond."

According to the defendant, she began to suspect that something nefarious was afoot when the clerks and the officers who had been in the office left them alone with the relatives, who were the trespassers about whom they had come to complain. She said that, at that point, she wanted to leave but "Officer Matt McGuire came up and stood there. And he spoke to us, he said, 'They're going to get papers.'" She said that when she asked, "What are these papers?" Officer McGuire told her that it was "'[j]ust some process.'" The defendant insisted that she "was just wanting to leave." She admitted that she "may have been upset, but I was ready to leave for the day." The defendant denied having raised her

-10-

voice but admitted, again, that she was "naturally a loud person." She said that Officer McGuire permitted her to leave, so she "walked out. I walked to the stairs." She insisted that Deputy Hill "came barreling down the stairs and said, 'Which one's it on' into his radio and grabbed me."

The defendant insisted that Deputy Hill forcefully grabbed her arms and pulled them up high behind her back. She testified that, after she told him, "'Don't touch me. Get off me,'" Deputy Hill "grabbed me, did it again, pulled and, I mean, he threw -- he threw me." She maintained that Deputy Hill grabbed "both arms, pulled them behind me, and twisted me and threw me around." She claimed that she had "red marks all over my arms. I had red marks on my . . . neck." She said she did not know why Officer Horne testified that she did not have any red marks on her arms.

The defendant conceded that she was "very upset, very emotional by the time I entered that second floor" because she "had just been assaulted. Fully assaulted." She insisted that, despite the testimony of Mr. Allison and Ms. Creamer to the contrary, Deputy Hill grabbed her and pushed her and that she "sat down in duress" because "I had no idea where this man was taking me. I had no idea what he was doing to me. I didn't know what was going on." She also insisted, despite the testimony to the contrary, that while she "was sitting on the" floor, Deputy Hill "held me for a period of time . . . as if he was worried I was going to run." She claimed that she "sat down willingly" "the second time" because she "had no idea where this man was taking me."

The defendant admitted that she knew that "there is a sign" that says that cameras were not permitted in the courthouse but said, "I never entered a courtroom that day. I went to the clerk's office on the second floor." She conceded that she was being loud, but said again that she was just "a naturally loud person." She also agreed that, although she could not "recall exactly what words were exchanged between me and those relatives," she and her relatives were being loud and cursing in the clerk's office. She denied that her husband shouted that Deputy Hill had pushed her, knocked her down, and pulled her hair. Instead, she claimed that she "heard him asking for a supervisor, panicking, requesting a supervisor to . . . please help his wife" because she "had just been assaulted by an officer for no reason." She insisted that "nobody had ever manhandled me my whole life until" Deputy Hill did so. The defendant explained,

> What I mean "manhandled," I mean a man that is twice my size, of the opposite sex, coming downstairs and grabbing me with force, pulling my hands up behind my back, throwing me around, making me fall to the stairs.

-11-

And even though I went in the general direction that this man was wanting me to go, he manhandled me all the way up those stairs.

. . . .

He was pushing me. I mean, as soon as I fell and hit the ground, and even though I was, like, walking up the steps, he still felt the need to grab ahold and, . . . like he needed to push me up the stairs. And, like, . . . I don't know what he was doing. And I still don't know where he was taking me.

I recalled my husband saying, "He's got her by the hair, by the back of the neck," as I was sitting on the ground because my hair braid laid on my neck, and he had me by the back of the neck.

The defendant testified that Deputy Hill did not drag her by the hair but that "[h]e had my hair in his hands by the back of my neck. . . . If my hair was pulled, it was pulled, but I don't even recall reporting anything like that, so." She reiterated that she had "[r]ed marks all over me. All over me."

Based upon this evidence, the jury convicted the defendant as charged of making a false report but acquitted Mr. Frye of the same charge.

After trial but before sentencing, the defendant's trial counsel moved to withdraw, and the trial court appointed sentencing counsel to represent the defendant. Following a sentencing hearing, the trial court imposed a sentence of two years to be served on probation.

On April 18, 2019, sentencing counsel moved the court to grant a new trial on grounds that trial counsel had been ineffective in his representation of the defendant. On that same day, sentencing counsel moved to withdraw on grounds that the defendant had "indicated her dissatisfaction" with his representation and intended to "report[] Counsel to the Bar." Also on that same day, the defendant filed pro se a pleading styled "Renewal of Motion for Judgment of Acquittal," claiming a fatal variance between the indictment and the proof at trial and challenging the sufficiency of the convicting evidence; a pleading styled "Motion for New Trial," claiming that the jury's verdict was against the weight of the evidence, that the trial court had committed "substantial error concerning the admission of evidence," and that she had been deprived of the effective assistance of counsel; and a Notice of Appeal to this court. On June 14, 2019, the defendant filed a pro

se motion to "correct the Illegal Sentence of 240 hours of mandatory community service based on the insufficiency of the attached order," claiming that the community service hours "would disrupt my work and home life."

On July 30, 2019, the defendant, by that time represented by her current attorney, moved the court, pursuant to Tennessee Rule of Criminal Procedure 35 to reduce her sentence. In her motion, the defendant asked the court to declare her an especially mitigated offender, reduce the length of her sentence to one year and 9.5 months, and to remove the community service condition of her probation. On August 2, 2019, the defendant filed an amendment to her Rule 35 motion, asking the trial court to grant her judicial diversion.

The defendant filed an amended motion for new trial on November 12, 2019, adding to her original motion claims that she was denied the right to a public trial and that "[t]he jury was improperly biased." She also added a nebulous claim for relief based upon "[o]ther prejudicial errors" apparently not based upon any particular principle of law. The trial court heard all of the defendant's motions on January 28, 2020, and, at the conclusion of the hearing, denied all forms of relief.

In this appeal, the defendant argues that the evidence was insufficient to support her conviction. She challenges the terms of her original probationary sentence, arguing that the conditions requiring her to complete 240 hours of community service and to undergo a mental health assessment were added post-judgment based upon an illegal order of the court and that they were not specifically tailored to her case. She also challenges the denial of her Rule 35 motion to reduce her sentence, claiming that she should be declared an especially mitigated offender, that her sentence should be reduced accordingly, and that she should be placed on judicial diversion. She asserts that the trial court improperly excluded her children and Ms. Arrington from the courtroom in violation of her constitutional right to a public trial. She contends that some comments made by potential jurors during voir dire biased the jury against her. Finally, she argues that she was deprived of the effective assistance of counsel at trial and at sentencing. We consider each claim in turn.

*I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, arguing that, because Deputy Hill's testimony supported a conclusion that his behavior satisfied the elements of simple assault, she could not have been convicted of making a false report. In a related claim, she argues that the "verdict was against the weight of the evidence" because the jury convicted her but acquitted Mr. Frye despite that Officer Horne testified that the Fryes told the "[s]ame story." The State contends that the defendant's sufficiency

-13-

argument "misses the mark" by concentrating on Deputy Hill's culpability under the assault statute and asserts that the evidence adduced at trial was sufficient to permit the jury to conclude that she had provided false information when she made the report against Deputy Hill. The State avers that the defendant's challenge to the weight of the evidence is a challenge to the trial court's thirteenth juror ruling, which is not reviewable on appeal.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case,

It is unlawful for any person to:

(1) Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:

(A) The offense or incident reported did not occur;

. . . . or

(C) The information relating to the offense reported is false[.]

T.C.A. § 39-16-502(1)(A),(C).

The evidence, viewed in the light most favorable to the State, established that Deputy Hill, after observing hostilities between Ms. Arrington and another couple, followed the couple to the second floor of the Kingsport Justice Center. He explained that he was concerned about the couple's interacting with the Fryes, who had already gone to the second floor. He was right to be concerned, given that a ruckus broke out between the two couples, who were shouting and cursing. Even the defendant acknowledged that she

-14-

and Mr. Frye had responded to the "smug remarks" of the other couple with cursing and admitted that she was "a naturally loud person." Both Mr. Allison and Ms. Creamer confirmed that they heard people being loud in the usually quiet area. Both also confirmed Deputy Hill's testimony that he placed his hand at the defendant's back to guide her out of the stairwell, that the defendant "flung" herself to the floor of her own accord, and that, at most, Deputy Hill rested his hand on her shoulder as she sat on the floor. Mr. Allison and Ms. Creamer said that Mr. Frye yelled for a supervisor and screamed that Deputy Hill was pulling the defendant's hair when, in fact, no such thing was happening.

The defendant's claim that Deputy Hill's testimony supports a conclusion that he committed the offense of simple assault ignores the fact that, when reporting Deputy Hill's alleged assault, the defendant told Officer Horne that Deputy Hill had grabbed her by the neck and thrown her down the stairs. She also claimed to have marks and bruises on her arm and neck; Officer Horne saw no evidence of the alleged injuries. The information provided by the defendant to Officer Horne, as well as the defendant's similar testimony at trial, was directly contradicted by the witnesses for the State. Moreover, even if we allowed the defendant's generous interpretation of Deputy Hill's testimony and the assault statute, we would still be constrained to conclude that the evidence was sufficient to support the defendant's conviction because there was simply no evidence that Deputy Hill "[i]ntentionally or knowingly cause[d] physical contact with" the defendant that "*a reasonable person* would regard . . . as *extremely offensive or provocative*." T.C.A. § 39-13-101(a)(3) (emphasis added). The jury, as was its prerogative, chose to accredit the testimony of the State's witnesses and conclude that the defendant had knowingly provided false information in support of an offense that she knew Deputy Hill had not committed. This evidence was sufficient to support the defendant's conviction.

As to the defendant's claim that the verdict was against the weight of the evidence, we note that this court does not reweigh the evidence. *Dorantes*, 331 S.W.3d at 379. Instead, "[t]he trial judge is in a position to weigh the evidence" in exercising his or her role as thirteenth juror "because he or she was present for the testimony and so had an opportunity to determine credibility." *State v. Stephens*, 521 S.W.3d 718, 727 (Tenn. 2017) (emphasis added). Here, the trial court approved the verdict as thirteenth juror and, further, reiterated at the hearing on the defendant's motion to reconsider the motion for judgment of acquittal, that the weight of the evidence supported the verdict of the jury. In making its finding, the trial court specifically found that the defendant's testimony "was not credible."

"A trial judge's position is in stark contrast to an appellate judge's, whose review of the case is limited to the cold written record of the trial" and who must view the evidence in the light most favorable to the State. *Stephens*, 521 S.W.3d at 727. Because "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight

-15-

and credibility of the evidence," "the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)). "[O]nce the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal" is limited to the consideration of the legal sufficiency of the evidence. *Burlison*, 868 S.W.2d at 719.

Additionally, contrary to the defendant's assertion, the jury's decision to acquit Mr. Frye has no legal significance with regard to the defendant's conviction. "The rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not our duty to unravel the ratiocinations of the jury's collective logic." *Jackson v. State*, 477 S.W.2d 213, 216 (Tenn. Crim. App. 1971) (citations omitted). "[T]he question whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached," and, accordingly, "verdicts as between two or more defendants tried together in a criminal case need not demonstrate rational consistency." *State v. Hamrick*, 688 S.W.2d 477, 481 (Tenn. Crim. App. 1985) (citations omitted).

## II. Sentencing

The defendant challenges both the sentence as originally imposed and the trial court's denial of her Rule 35 motion to reduce her sentence.

Neither party presented any evidence at the March 20, 2019 sentencing hearing. The trial court, observing that the defendant had "a very good record," stated that it was "inclined to just set the minimum or two-year sentence and have it on probation. Probation's here today." Following a brief discussion with sentencing counsel, the defendant indicated that she would "graciously accept" the sentence. The trial court told the defendant that she would "just need to follow any terms that they provide. Ms. McConnell will meet with you just out here and she can give you any terms."

The probation order, which was signed by the defendant on April 2, 2019, lists among the conditions of probation the completion of 240 hours of community service and a mental health assessment. During the period of time following sentencing counsel's withdrawal from the case based upon the defendant's threat to report him to the board of professional responsibility, the pro se defendant filed a number of motions, including a "Motion for Correction of Illegal Sentence." In that motion, the defendant argued that the conditions of her probation requiring her to complete 240 hours of community service and to complete a mental health assessment were illegal "based on the insufficiency of the attached order" from February 7, 2018. She asserted that she did not agree to the terms at the sentencing hearing and that she did not learn of them "until my intake at probation after

-16-

sentencing." She argued that completing the community service hours "would disrupt my work and home life." The defendant appended to her motion an order signed by the trial court on February 7, 2018, that "ordered that any offender sentenced to a term of probation supervision perform ten (10) hours community service work for each month the offender is to be supervised (not to exceed a total of 360 hours), unless the performance or non-performance of community service is part of any plea negotiations."

On July 30, 2019, the defendant, represented by her current counsel, moved the trial court pursuant to Tennessee Rule of Criminal Procedure 35 to reduce her sentence. She asked the court to designate her an especially mitigated offender, reduce her sentence from two years to one year and 9.5 months, and to remove the community service condition of her probation. She argued that because she was not made aware of the condition at sentencing, she was unable to tell the court that she would be unable to complete the community service without working a financial hardship on her family. She amended her Rule 35 motion on August 2, 2019, to ask the trial court to grant her judicial diversion.

At the hearing on the defendant's Rule 35 motion, Mr. Frye testified that the defendant "works as many as up to 40 hours or more per week" from the couple's home as "a call center representative" and that she was partially responsible for homeschooling the couple's two children, aged 11 and nine. He said that the defendant was the primary breadwinner while he performed "contracting" work "for Amazon" "when I have extra time" to bring in "a little bit of extra money." Mr. Frye claimed that he was unable to work full-time because "I jointly educate the children. I take care of the home. I take care of my disabled parents. . . . And I also help take care of my grandfather who's also disabled." He said that the defendant had no driver's license and did not drive, which meant that he "would have to take her" to her community service appointments, "and we would have to arrange some kind of childcare while we done that." Mr. Frye insisted that, if the defendant were forced to take time off of work to complete her community service, "it makes it really hard to meet ends."

During cross-examination, Mr. Frye reiterated that the defendant worked an average of 40 hours a week in 10-hour shifts. He said that although the family lived with Mr. Frye's parents, neither his mother nor his father could drive the defendant to her community service or take care of the children while Mr. Frye did so. Mr. Frye acknowledged that the couple lived within a short distance of several facilities at which the defendant could perform her community service. Mr. Frye could not recall the specific number of community service hours the defendant had already completed, saying, "I'm not for certain. I think just a few."

The defendant did not testify and did not present any documentary proof of her employment information at the hearing.

Lieutenant Lane testified on behalf of the State that the Fryes refused to cooperate with the Internal Affairs investigation into the defendant's complaint against Deputy Hill. He recalled that when he finally spoke to Mr. Frye, Mr. Frye "[s]aid that him and his wife had obtained counsel." Lieutenant Lane told Mr. Frye to have their attorney contact him, but that did not happen. He said that this was the only case in his entire career wherein the alleged victim had retained counsel. He confirmed that enduring the investigation and being put on administrative leave would have been embarrassing for Deputy Hill.

Haley Gressett, an employee of the Tennessee Department of Probation and Parole, testified that the trial court had issued a standing order requiring 10 hours' community service per month as a condition of probation in all cases. Ms. Gressett said that she discussed the community service requirement with the defendant. She said that the department had "a community service officer that assigns individuals to specific facilities" and that she scheduled an appointment for the defendant to meet with the community service officer. Ms. Gressett said that individuals could request a different facility placement if the original assignment did not work for them.

Ms. Gressett testified that the defendant had completed only one hour of community service by the time of the hearing. When Ms. Gressett asked the defendant why she had not completed her community service, "she stated that it was not gave to her in court, and that she was discussing it with her lawyer, and her lawyer told her not to do it. And that she was going to take the issue up further with her lawyer." Ms. Gressett said that, at that point, she told the defendant "that there was a blanket order. I also gave her a copy of that order."

Ms. Gressett said that, as part of her supervision of the defendant, she kept a record of the hours that the defendant worked. At the defendant's most recent appointment, "she reported that she was working less than 40 hours a week." She said that the defendant reported that she was working "less than 40" hours per week at every appointment. A check stub presented by the defendant to Ms. Gressett for the month of September 2019 reflected that the defendant had worked a total of 46 hours in the two-week pay period.

During cross-examination, Ms. Gressett said that she gave a copy of the court's order to the defendant on April 10, 2019. Ms. Gressett acknowledged that the defendant had indicated that her work hours could fluctuate but said that "on her monthly report forms that she fills out each time she's in the office, so far everything she's put is less than 40 hours." She stated that the report forms did not "specify are you full-time or part-time. We ask for the hours."

At the conclusion of the hearing, the trial court expressed concern "about the difference" between Mr. Frye's testimony that the defendant works full time and has done so "for the last two or three years" and the information provided by the defendant on her affidavit of indigency, wherein she indicated that "she works less than . . . 40 hours." The court added that the defendant "hasn't done herself any favors by doing one hour of community service in almost a year." The court found that the defendant had "the ability to do community service" and ordered the defendant to begin her community service immediately. The court observed that the accusations had had a "profound effect" on Deputy Hill. The court declined to "categorize her as an especially mitigated offender." The trial court also denied the defendant's request for judicial diversion, finding that the grant of diversion is "an extraordinary event" and "that she would not be a good candidate for that."

The defendant presented no evidence in support of her claim that the trial court's standing order requiring community service as a condition of probation rendered her sentence illegal. The trial court observed that the order in question was entered on February 7, 2018, well before the imposition of the defendant's sentence and denied the motion.

*A. Original Sentence*

Both of the defendant's challenges to the sentence as originally imposed relate to the 240 hours' community service imposed as a condition of her probation. She claims that the condition, which was added by a blanket order of the trial court, was erroneously imposed by the court post-judgment and that it violates the requirement that sentences be imposed based upon the facts of each individual case. The State contends that the record does not support the defendant's claim that the community service condition was added post-judgment. The State also avers that nothing about the blanket order of the trial court or the procedure employed for the imposition of the community service requirement violated any laws.

The Sentencing Act provides that "the trial court has great latitude in formulating punishment, including the imposition of conditions on probation." *State v. Burdin*, 924 S.W.2d 82, 85 (Tenn. 1996). The primary purpose of a sentence of probation, however, "is rehabilitation of the defendant," *id.* at 86, and the conditions of probation must be suited to this purpose. "Once the trial judge determines that probation is justified under the circumstances, the conditions imposed must be reasonable and realistic and must not be so stringent as to be harsh, oppressive or palpably unjust." *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). The Sentencing Act does not grant to the trial court "unfettered authority" to impose any condition on the defendant's probation but limits the court's discretion to "the bounds of traditional notions of rehabilitation." *Burdin*, 924 S.W.2d at

87; *see also State v. Mathes*, 114 S.W.3d 915, 918 (Tenn. 2003) (disapproving probation condition that did "not serve either the goal of rehabilitation or the goal of deterrence"); *State v. Robinson*, 139 S.W.3d 661, 666 (Tenn. Crim. App. 2004). That being said, however, the burden of demonstrating the impropriety of a probation condition rests with the defendant. *Burdin*, 924 S.W.2d at 84.

Code section 40-35-303 provides, in pertinent part:

(d) Whenever a court sentences an offender to supervised probation, the court shall specify the terms of the supervision and may require the offender to comply with certain conditions that may include, but are not limited to:

(1) Meet the offender's family responsibilities;

(2) Devote the offender to a specific employment or occupation;

(3) Perform, without compensation, services in the community for charitable or governmental agencies;

(4) Undergo available medical or psychiatric treatment and enter and remain in a specified institution whenever required for that purpose by voluntary self-admission to the institution pursuant to § 33-6-201;

(5) Pursue a prescribed secular course of study or vocational training;

(6) Refrain from possessing a firearm or other dangerous weapon;

(7) Remain within prescribed geographical boundaries and notify the court or the probation officer of any change in the offender's address or employment;

(8) Submit to supervision by an appropriate agency or person and report as directed by the court;

(9) Satisfy any other conditions reasonably related to the purpose of the offender's sentence and not unduly restrictive

of the offender's liberty or incompatible with the offender's freedom of conscience, or otherwise prohibited by this chapter;

(10) Make appropriate and reasonable restitution to the victim or the family of the victim involved pursuant to § 40-35-304;

(11)(A) Undergo an alcohol and drug assessment or treatment, or both an assessment and treatment, if the court deems it appropriate and licensed treatment service is available;

. . . .

(12)(A) Use a transdermal monitoring device or other alternative monitoring device if the court determines that the defendant's use of alcohol or drugs was a contributing factor in the defendant's unlawful conduct and the defendant is granted probation on or after July 1, 2014. If the defendant is granted probation on or after July 1, 2016, and the court orders a monitoring device but determines that the person is indigent, the court shall order that the portion of the costs of the device that the person is unable to pay be paid by the electronic monitoring indigency fund, established in § 55-10-419;

. . . .

T.C.A. § 40-35-303(d).

The trial court ordered probation and specifically told the defendant that Ms. McConnell, presumably a probation officer, would go over the terms of the probation with her. Although the judgment form itself does not contain a reference to community service or mental health assessment in the special conditions box, the probation order signed by the defendant includes both. The defendant's signature on this document belies her claim of lack of notice. That the probation order containing both conditions was signed by the defendant before the entry of the judgment order, belies her claim that the conditions were added post-judgment. This court has previously approved of the same procedure employed by the trial court, and, indeed, it is the same procedure routinely employed in the trial courts in this state. In *State v. Quintin O'Neal Dukes*, Dukes took "issue with the difference between the written terms in his probation order versus the terms the trial court orally discussed with him," arguing that he could not be bound by the conditions in the probation order because they were not enumerated by the trial court in open court or listed on the judgment form. *See State v. Quintin O'Neal Dukes*, No. M2007-01164-CCA-R3-CD, 2008

-21-

WL 343163, at *2 (Tenn. Crim. App., Nashville, Feb. 4, 2008). Noting that the defendant and the trial court had signed a probation order that contained all of the conditions of probation, we concluded that the fact that the trial court did not explain all the conditions in open court did not impact the validity of the probation order. We held that because the order "was signed by the trial court" and the defendant, "all terms and conditions listed in the order are binding and imposed by the court. . . . That the court did not expressly discuss every term with the [d]efendant, but let a probation officer perform that role, does not lessen the authority of those terms." *Id.*

Code section 40-35-303 lists community service as a condition that the trial court may routinely place on probationary sentences. *See* T.C.A. § 40-35-303(d). Examining the conditions listed in Code section 40-35-303, our supreme court observed that

> the enumerated conditions are closely related to conventional societal duties—family support, productive employment, community service, personal health, vocational training, avoidance of dangerous instruments, cooperation with supervising agencies, and restitution. These permissible conditions focus on the offender and those persons charged with the offender's supervision. These conditions offer no dramatic departures from traditional principles of rehabilitation.

*Burdin*, 924 S.W.2d at 85. The trial court's order adding community service to the list of all conditions that all probationers must satisfy reflects the court's judgment that community service is appropriate for those within the court's jurisdiction. The order also provides an avenue for probationers to seek relief from their community service requirement. The defendant did not pursue relief via that avenue.

The defendant's citation of Tennessee Supreme Court Rule 18 is inapt and does not avail her of any relief. "Tennessee Supreme Court Rule 18 requires trial courts to adopt written uniform local rules of procedure addressing certain subjects" and permits "[e]ach judicial district" to "adopt other uniform rules not inconsistent with the statutory law, the Rules of the Supreme Court, the Rules of Appellate Procedure, the Rules of Civil Procedure, the Rules of Criminal Procedure, the Rules of Juvenile Procedure, and the Rules of Evidence." *In re Bonding*, 599 S.W.3d 17, 19 (Tenn. 2020) (quoting Tenn. Sup. Ct. R. 18(a) and citing T.C.A. § 16-3-407 (2009)). The order at issue in this case does not adopt a uniform rule of procedure and is not, in any event, inconsistent with any other rule of law. As indicated, Code section 40-35-303 specifically permits ordering community service as a condition of probation.

*B. Rule 35 Motion*

As indicated, the defendant asked the trial court to declare her an especially mitigated offender, reduce her sentence by 10 percent, and place her on judicial diversion. The defendant also asked the court to remove the community service requirement from her probation. The State argues that the trial court did not err by denying the defendant's request for judicial diversion because the trial court cannot grant judicial diversion in a Rule 35 proceeding. The State also asserts that the trial court did not abuse its discretion by denying the defendant's other requests.

Tennessee Rule of Criminal Procedure 35 provides that "[t]he trial court may reduce a sentence upon motion filed within 120 days after the date the sentence is imposed or probation is revoked." Tenn. R. Crim. P. 35(a). "The court may reduce a sentence only to one the court could have originally imposed." Tenn. R. Crim. P. 35(b). "The intent of this rule is to allow modification only in circumstances where an alteration of the sentence may be proper in the interests of justice." Tenn. R. Crim. P. 35, Advisory Comm'n Comments. Where, as here, the defendant did not plead guilty in exchange for an agreed sentence, "Rule 35 functions simply as a second opportunity for a defendant to make a plea for leniency. It provides the trial court an opportunity to again consider, 'after reflection or upon receipt of new probationary reports or other information,' whether the initial sentence is too severe for any reason." *State v. Patterson*, 564 S.W.3d 423, 434 (Tenn. 2018) (citation omitted). This court reviews the trial court's decision to grant or deny a Rule 35 motion for an abuse of discretion. *State v. Irick*, 861 S.W.2d 375, 376 (Tenn. Crim. App. 1993).

We need not tarry long over the defendant's claim that the trial court erred by denying her bid for judicial diversion. Judicial diversion is not now, and never has been, a sentence. *See, e.g.*, *State v. Turco*, 108 S.W.3d 244, 247 (Tenn. 2003); *Alder v. State*, 108 S.W.3d 263, 267 (Tenn. Crim. App. 2002) ("The judicial diversion probationary period is not a sentence nor is it punishment."). For this reason, "judicial diversion is not available as Rule 35(b) relief." *Turco*, 108 S.W.3d at 248.

Similarly, the trial court did not abuse its discretion by denying her requests to be classified as an especially mitigated offender and to modify the conditions of her probation.

A trial court "may find the defendant is an especially mitigated offender, if . . . [t]he defendant has no prior felony convictions; and . . . [t]he court finds mitigating, but no enhancement factors." T.C.A. § 40-35-109(a). "Whether an accused should be sentenced as an especially mitigated offender is a question which rests within the sound

discretion of the trial court." *State v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993) (citing *State v. Buttrey*, 756 S.W.2d 718, 722 (Tenn. Crim. App. 1988)). Generally, "[a] trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). Although it is true that the defendant had no criminal record and that the trial court found no enhancement factors, nothing in the record suggests that the trial court abused its discretion by refusing to classify the defendant as an especially mitigated offender. By using the permissive "may" in Code section 40-35-109, the legislature clearly indicated that not every defendant so situated is entitled to be classified as an especially mitigated offender. *Braden*, 867 S.W.2d at 762-63.

As to the modification of the terms of probation, Mr. Frye testified that the defendant's performing community service would have a negative financial impact on the family, but his testimony about the number of hours that the defendant worked conflicted with the number of hours that the defendant reported on her affidavit of indigency and on the forms submitted to her probation officer. The record also establishes that the defendant did not actually try to comply with the community service requirement. Instead, she performed one hour and then refused, telling her probation officer that her lawyer had told her not to comply with the trial court's order. Given that she did not actually attempt to comply with the court's order, her claim that complying with the order would negatively impact her family strains the bounds of credulity.

### III. Public Trial

The defendant asserts that the trial court violated her constitutional right to a public trial by improperly excluding her children from the courtroom. She also argues that, because her father-in-law had to leave the courtroom to care for the children, the trial court's excluding the children necessarily excluded him from the courtroom. Finally, she contends that Ms. Arrington was effectively excluded from the courtroom when the lengthy booking process following her arrest at the end of the first day of the trial caused her to be too tired to attend the second day of trial. The State contends that the defendant has waived plenary review of her public trial claim by failing to raise a contemporaneous challenge to the alleged exclusions and that she has failed to establish entitlement to relief following a plain error review.

At the hearing on the defendant's motion for new trial, Mr. Frye testified that his father, daughter, son, and Ms. Arrington all came to court on the first day of the joint trial to support the Fryes. Mr. Frye claimed that on the first day of trial "maybe an hour or two in, I'm not exactly sure when," he and the defendant "were pulled out of the courtroom" by trial counsel, "and he said that our kids needed to be removed from the

-24-

courtroom." He said that because his father "was watching the children," "when they were removed from the courtroom, he had to go as well." They remained outside the courtroom for the remainder of the first day of trial. Mr. Frye claimed that, on the second day of trial, trial counsel "stopped us at the door and said that the kids wasn't allowed inside." Mr. Frye said that he told trial counsel that he "didn't agree with that" and that counsel replied that "if we didn't keep them outside, then the bailiff was going to order it or have the judge order it, is what he said." As a result, the children and Mr. Frye's father remained outside for the remainder of the second day of trial. Mr. Frye said that the children sat behind him and that he did not hear them talking or causing any type of disturbance at any point before they were asked to leave.

Mr. Frye testified that Ms. Arrington was charged in the same presentment but not jointly tried with Mr. Frye and the defendant. Mr. Frye said that, despite Ms. Arrington's having attended a number of pretrial court appearances with the Fryes, she had not been served with an arrest warrant or taken into custody prior to the Fryes' joint trial. Mr. Frye recalled that, during a jury-out hearing, the prosecutor recognized Ms. Arrington on a video recording "and pointed her out in the crowd." "I believe just a few seconds after that, she may . . . have told a bailiff to either arrest her or that she had a warrant or something along those lines." Ms. Arrington was permitted to remain in the courtroom for the remainder of the first day of trial, "[b]ut later on they arrested her that day." He claimed that, because "she stayed incarcerated until pretty late that night, . . . she wasn't able to attend the second day of trial the next day." He acknowledged that Ms. Arrington had been freed on bond by the time of trial on the following day but was nevertheless unable to attend because she was tired.

During cross-examination, Mr. Frye admitted that both he and the defendant were present when Ms. Arrington was released from jail and that they both managed to attend the second day of trial without any issues. He conceded that he was unable to observe his children while they sat behind him. Mr. Frye acknowledged that the bailiff did not remove the children but claimed that trial counsel "told us that we had . . . to remove the kids." He agreed that the trial court did not order the children out and that State did not ask on the record to have the children removed. It was Mr. Frye's recollection that no witnesses were presented on the second day of the trial.

During redirect-examination, Mr. Frye claimed that trial counsel "said that if I didn't remove the kids from the courtroom, that it would cause a ruckus." He also insisted, for the first time, that counsel told the Fryes that the jury would "hold it against us" and that "[t]hey would see us as a trouble starter or something along those lines, is what he said." He reiterated during recross-examination, however, that the trial court did not order the children to be removed and that he did not hear either the prosecutor or the bailiff ask that they be removed.

-25-

Mr. Frye's father testified that he sat with the Fryes' children on the first day of trial and that the children were well behaved and not "disruptive at all." He said that, when the children were asked to leave, he was forced to sit with them in the hall for the remainder of the day. He recalled that trial counsel "told me right off the bat" on the second day "that the kids couldn't go in. So I was stuck outside with them for the whole day again." During cross-examination, he agreed that the trial court did not order the children out and that neither the prosecutor nor the bailiff told him that the children could not be in the courtroom.

The bailiff, Officer Gott, testified that although he remembered the trial, he did not "remember anything about the kids." He could not recall the children being disruptive or asking trial counsel to have the children removed from the courtroom. He said that, although he could not recall even having seen the children, if he told counsel to have them removed, "they was probably doing something where I would have asked them to leave." He said that no member of the district attorney's office had "never asked me to do something like that."

The Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution afford an accused the right to a "public trial." *See In re Oliver*, 333 U.S. 257 (1948); *State v. Sams*, 802 S.W.2d 635 (Tenn. Crim. App. 1990). This right is regarded as "a shared right of the accused and the public, the common concern being the assurance of fairness." *Press Enterprise Co. v. Superior Court*, 478 U.S. 1, 7 (1986). "Transparency," it has been said, "is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused." *Smith v. Doe*, 538 U.S. 84, 99 (2003). The right to a public trial is not absolute, however, and in certain cases must yield to other rights or interests. *See Waller v. Georgia*, 467 U.S. 39, 45 (1984). The right to a public trial has

> generally been recognized as being subject to a court's inherent power to regulate admission to the courtroom and to restrict attendance at the trial as conditions and circumstances may reasonably demand in order to preserve order and decorum, or to protect the rights of the parties and the witnesses, or generally to further the administration of justice.

*State v. Jordan*, 325 S.W.3d 1, 52-53 (Tenn. 2010) (citations and internal quotation marks omitted). Importantly, "not every public-trial violation results in fundamental unfairness." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1909 (2017).

We agree with the State that the defendant has waived plenary review of this issue by failing to raise a contemporaneous objection to her children's exclusion from the courtroom. We also agree with the State that the defendant cannot establish entitlement to relief for plain error.

This court will grant relief for plain error only when:

(1) the record clearly establishes what occurred in the trial court; (2) the error breached a clear and unequivocal rule of law; (3) the error adversely affected a substantial right of the complaining party; (4) the error was not waived for tactical purposes; and (5) substantial justice is at stake; that is, the error was so significant that it "probably changed the outcome of the trial."

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

Both Mr. Frye and his father claimed that trial counsel told them that the children could not remain in the courtroom. Mr. Frye claimed at different points in his testimony that the prosecutor and the bailiff had told trial counsel to remove the children but acknowledged that he did not actually hear either the prosecutor or the bailiff communicate this request to trial counsel. Because the record does not clearly establish what happened in the trial court, the defendant has failed to establish entitlement to plain error relief. Moreover, the defendant has failed to establish that a clear and unequivocal rule of law has been breached. The State did not request, and trial court did not order, at any point, that the children be removed or excluded from the courtroom. Officer Gott testified that he could not recall asking counsel to have the children removed from the courtroom but said that, if he did so, it would have been because they were being disruptive. The defendant's right to a public trial is subject to the trial court's decision to exclude certain members of the public "to preserve order and decorum." *Jordan*, 325 S.W.3d at 53. Finally, the defendant has failed to establish that a trial court error adversely affected a substantial right because, indeed, she has failed to establish any trial court action at all.

The claim with regard to Ms. Arrington borders upon the absurd.[3]  Ms. Arrington did not testify at the hearing, so, in reality, we do not know why Ms. Arrington did not attend the second day of the trial.  Furthermore, the proof presented on this issue, even when viewed in the light most favorable to the defendant, established that Ms. Arrington decided of her own accord not to return for the second day of trial because she was tired from the booking process the night before.  Ms. Arrington's personal decision based upon her own physical wellbeing does not implicate any of the defendant's constitutional rights.

*IV.  Juror Bias*

The defendant contends, as she did in her motion for new trial, that answers given by potential jurors during voir dire biased the petit jury ultimately selected to hear her case.  She also claims that Officer Gott's personal relationship with one of the jurors could have improperly influenced the jury.  She presented no proof in support of her claim at the hearing on the motion for new trial.

During voir dire, Potential Juror A told the trial court that she knew Sergeant Murray and his family from the community and that, though she "would try to be fair," "as far as believing him, I know him to be honest and straightforward."  Potential Juror A was ultimately excused.  Potential Juror B revealed that his brother-in-law practiced criminal defense and that, as a result of their interactions, he had the "impression" that criminal defense attorneys were less than forthright.  Potential Juror B was also excused.  Finally, Officer Gott informed the court and the parties that Potential Juror C's wife worked as a "full-time aide" to Officer Gott's son.  Potential Juror C was ultimately seated on the jury.

The criminal accused possesses the right to trial by an impartial jury as guaranteed by the state and federal constitutions.  See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."); Tenn. Const. art. I, § 9 ("[I]n all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the county in which the crime shall have been committed . . . .").  The Supreme Court has observed that "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved" in a trial.  *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975).  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* at 800.  A "verdict will not be overturned because of jurors' generalized knowledge of the parties or of some other aspect of the case."  *Caldararo by Caldararo v. Vanderbilt Univ.*, 794

---

[3]    We note that "counsel is not required to investigate or raise unreasonable or frivolous claims regardless of a [defendant]'s demands."  *Leslie v. State*, 36 S.W.3d 34, 39 (Tenn. 2000).

S.W.2d 738, 743-44 (Tenn. Ct. App. 1990) (citations omitted). Due process does not require a jury completely free "from every contact or influence that might theoretically affect their vote" but "means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The defendant must "demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800.

The record establishes that, rather than a shocking series of revelations designed to poison the jury pool, Potential Jurors A and B indicated that they had personal relationships that might impact their ability to act impartially and were, as a result, excluded from the jury. Officer Gott, who was not a party or a witness, indicated that Juror C's wife worked with Officer Gott's son. Lawyers, judges, and police officers have lives outside the courtroom that cause them to interact with one another and members of the public in any number of benign ways. The purpose of voir dire is to uncover any such relationships that might affect the ability of a particular potential juror to try a case impartially. That is exactly what happened in this case. The relationships were discovered during voir dire, and, after it became clear that those in question could not function as impartial triers of fact, they were excused. The defendant presented no proof that any of the challenged revelations tainted the jury that ultimately heard the case. Her claim that the jury might have been improperly influenced by the comments during voir dire is nothing more than rank speculation. Her claim that "if Juror C[] was familiar" with Officer Gott, "he may have improperly influenced the jury to credit Deputy Hill's testimony simply because of his respect for the creditability of [Officer] Gott who worked for the same agency" does not even rise to the level of rank speculation and would be better classified as wild conjecture. In any event, no proof exists of "the actual existence of" any "opinion in the mind of" any particular member of the petit jury sufficient to give rise to "the presumption of partiality." *Murphy*, 421 U.S. at 800.

## V. *Ineffective Assistance of Counsel*

The remainder of the defendant's claims relate to her assertion that she was deprived of the effective assistance of counsel at trial and sentencing. At this point, we note the peril that generally accompanies raising this issue on direct appeal. "[T]his court has consistently 'warned defendants and their counsel of the dangers of raising the issue of ineffective assistance of trial counsel on direct appeal because of the significant . . . amount of development and factfinding such an issue entails.'" *See State v. Mosley*, 200 S.W.3d 624, 628-29 (Tenn. Crim. App. 2005) (quoting *Kendricks v. State*, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999)). The State warned the defendant correctly that if she "want[ed] to go forward and argue that[] they lose their right, their ability to file any other post-

-29-

conviction matter" related to the effective assistance of counsel. Defense counsel argued that it was her reading of the Post-Conviction Procedure Act and the rules of the supreme court, despite the decades of case law to the contrary, that if the defendant did not raise the issue in her motion for new trial, it could be deemed waived in any future post-conviction proceeding.[4] To state it plainly, "the failure to raise an ineffective assistance claim on direct appeal does not bar the claim in later collateral proceedings." *Cauthern v. State*, 145 S.W.3d 571, 604-05 (Tenn. Crim. App. 2004) (citing *Massaro v. United States*, 538 U.S. 500, 504 (2003)).

In a move that defies reason, the defendant also opposed the State's motion to continue the hearing on the motion for new trial to secure trial counsel's presence. At the hearing on the motion to continue, defense counsel stated that she understood "why the State wants to have [trial counsel] here" but that "this isn't new information" and that the State had had time "to arrange with [trial counsel]." The defendant is fortunate that the State endeavored to secure trial counsel's appearance at the hearing on the defendant's motion because, otherwise, her claim would have necessarily failed without having been fully and properly litigated. *See State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) (holding that the danger of previous determination is the reason this court has repeatedly warned that claiming ineffective assistance of counsel on direct appeal is "a practice fraught with peril"). Generally speaking, "the [S]tate should present the attacked counsel to show what occurred," *see State v. Craven*, 656 S.W.2d 872, 873 (Tenn. Crim. App. 1982), but the burden of proof on an ineffective assistance of counsel claim lies with the proponent, in this case the defendant, *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). We reiterate that "[t]he better practice is to make an ineffective assistance of counsel claim in a post-conviction proceeding." *Mosley*, 200 S.W.3d at 628. As it stands, the defendant's decision to raise the claim of ineffective assistance of counsel in her motion for new trial precludes further review of the performance of both trial counsel and sentencing counsel in any future post-conviction proceeding. We turn then to the defendant's claims regarding those attorneys.

At the hearing on the defendant's motion for new trial, Mr. Frye testified that he and the defendant were charged along with Ms. Arrington in a single presentment with one count of making a false report. He and the defendant hired trial counsel to represent both of them. Mr. Frye recalled that trial counsel counseled the Fryes about the potential for a conflict of interests arising from the joint representation and that he asked the Fryes to sign a waiver of any conflict of interests. Despite this and the fact that the cases were being tried jointly, Mr. Frye insisted that he believed that trial counsel would address his and the defendant's cases "separately." Mr. Frye said that he felt that he had no option but

---

[4]    This court also warned counsel about the peril of proceeding with an ineffective assistance of counsel claim on direct appeal, but counsel again persisted.

to sign the waiver of the conflict of interests because the Fryes had paid trial counsel a non-refundable retainer. He claimed that he did not "fully understand to this day what it meant" to waive the conflict of interests, saying, "To my understanding, I just thought that I had to sign for him to be able to legally represent us."

Mr. Frye testified that he did not understand the charge against him and that trial counsel did little to clarify things. Mr. Frye said that he and the defendant provided trial counsel with a photograph purported to be of the defendant with red marks on her arm and neck following the encounter with Deputy Hill. Mr. Frye claimed that trial counsel told the Fryes "that he intended to use it at trial . . . to negotiate a dismissal, is what he said." Trial counsel did not introduce the photograph at trial, and, according to Mr. Frye, told them after the trial that he had simply forgotten to do so.

Mr. Frye testified that both he and the defendant were wearing audio recording devices on August 13, 2015, and that they discussed the use of a short clip from those audio recordings that purported to capture the encounter with Deputy Hill in the stairwell at trial "many times." Mr. Frye said trial counsel told the defendant "that she would have to testify in order to be able to play the audio recording." Nevertheless, trial counsel did not endeavor to admit the recording into evidence at trial. Mr. Frye claimed that trial counsel did not ever discuss the possibility of Mr. Frye's testifying at trial despite that Mr. Frye had also worn an audio recording device on August 13, 2015.

Mr. Frye testified that the Fryes provided trial counsel with a list of potential witnesses but that trial counsel did not speak with any of them prior to trial and issued no subpoenas. Specifically, Mr. Frye said that the Fryes wanted trial counsel to subpoena Officer Matt McGuire "because we felt like he was telling the truth." Mr. Frye said that, to his knowledge, trial counsel did not interview Officer McGuire prior to the trial and did not issue a subpoena to secure Officer McGuire's attendance at trial.

Mr. Frye recalled that when they asked trial counsel to move for a change of venue, "he refused to do it, is what he told us." Mr. Frye said that the Fryes wanted a change of venue "because it was a Sullivan County officer that was alleging these things. And it was a Sullivan County court that was hearing it. And we didn't know if that was a conflict or not, so we brought that up." Mr. Frye also recalled that trial counsel failed to subpoena communications from both the SCSO and the KPD regarding the Fryes as they had asked him to do. It was Mr. Frye's opinion that trial counsel had performed deficiently in his representation of the defendant.

During cross-examination, Mr. Frye acknowledged that the jury acquitted him of the charge of making a false report. Mr. Frye maintained that he did not understand the charge against him, saying that he "read the presentment. I just don't know specifically

what they were alleging was false." Mr. Frye agreed that he had no photograph that purported to show any injury to the defendant's neck but said that he could see a mark on the defendant's neck in the photograph of her arm "because I . . . seen it the day that it was there, and I can look at the photo and . . . tell that that's where it was." Mr. Frye said that the defendant was "very fair skinned" and that she "gets sunburned easy and . . . bruises easy and things like that."

Mr. Frye testified that Ms. Frye was in the stairwell "for 15 to 30 seconds before" Deputy Hill "led her back upstairs." Mr. Frye said that he provided an audio recording that was an hour or an hour-and-a-half in length to trial counsel. He claimed that the recording captured Deputy Hill's "feet stomping. You can hear him chasing us down." He also claimed that the recording captured "shuffling" that he asserted was the sound of Deputy Hill twisting the defendant around. He acknowledged that someone would have had to testify and narrate the recording in order for the jury to understand what it had allegedly captured. Mr. Frye agreed that Deputy Hill did not yell during the encounter but claimed that the deputy was "speaking loudly." Mr. Frye insisted that he did not yell either, saying, "I definitely raised my voice, but I don't know that I was yelling."

Mr. Frye conceded that Officer McGuire was not in the stairwell and that he was not "involved in anything that [Deputy] Hill had done." He insisted that Officer McGuire could have testified that he told the Fryes that they "weren't being detained, and that he couldn't hold us." He said that he understood that the issue whether Deputy Hill had the authority to bring the defendant back up the stairwell was irrelevant to the charge of making a false report.

With regard to the Fryes' desire to have a change of venue, Mr. Frye conceded that he had no idea of the standard applied to requests for a change of venue, saying, "Well, it was just my personal opinion that I felt it would be fair. But other than that, I had no other comment." Mr. Frye said that he did not testify because trial counsel "advised me not to" because "he didn't think I should have to testify." Mr. Frye claimed that the defendant did not want to testify.

Trial counsel testified that he represented the Fryes at their joint trial in February 2018. He recalled that the original trial judge, who retired prior to trial, asked him to have the Fryes execute a waiver of any potential conflict of interests. Trial counsel said that he used the language that the trial judge told him to use for the waiver and that both Fryes signed the waiver. He said that he discussed a waiver with the Fryes "when I was first hired. We sent in a waiver, filed the waiver, and then the judge wanted to go over appropriate language about the waiver."

Trial counsel testified that he and the Fryes "talked in detail about the case, and I talked a number of times on what they were being accused of" and that "they knew what they were charged with." He said "there was never any conversation about them being confused about what was going on." Trial counsel testified that he did not tell the Fryes that he thought the photograph of the defendant's arm should be offered into evidence. Instead, he said, "I remember them telling me they thought it would be introduced in evidence." He did not intend to offer the photograph because "I couldn't see hardly anything on the photograph."

Trial counsel testified that he reviewed the audio recording provided to him by Mr. Frye but that he did not do so together with the Fryes because he "tried to get [the Fryes] to come down to Knoxville to several meetings, but they could never make it, so it was hard to do it in person or view anything with them." He recalled that the Fryes attended "maybe two" meetings in Knoxville but that "most of the time they couldn't get down there or something like that." He said that they spoke on the telephone "several times" and discussed the audio recording "a lot." He adamantly denied telling the Fryes that he intended to offer the audio recording into evidence, saying, "I didn't want it to go into evidence. And I told them that during trial, too." He specifically denied telling the defendant that she would have to testify in order to have the audio recording admitted into evidence. Instead, trial counsel recalled having told the defendant that he wanted "her [to] tell the jury herself what happened instead of them being able to hear that audio recording because I thought the audio recording would damage the case." He agreed that he provided both the photograph and the audio recording to the State "[b]ecause it was reciprocal discovery" and he "wanted to make sure they had it just in case it was introduced into evidence."

Trial counsel testified that he did not recall the Fryes' asking him to subpoena Officer McGuire and did not recall what was contained in Officer McGuire's statement. He also could not recall whether he spoke to any of the officers or other witnesses in this case. Trial counsel said that he did not go to the Kingsport Justice Center specifically in preparation for this case but that he had been there before in the scope of his practicing law. He said that he did not see any need to visit the scene or take any photographs in preparation for trial. Trial counsel did not recall the Fryes' asking about a change of venue but said that he saw no "reason why that it would be a valid argument to request a change of venue."

Trial counsel recalled the bailiff's telling him that the Frye children would need to leave the courtroom and his then "passing along that message to" the Fryes. He said that he did not recall why the children were to be removed from the courtroom because he "was getting ready for trial." He did not ask for a hearing about the children's removal. Trial counsel said that, because the children were behind him at the time, he could not say

-33-

whether they were being disruptive. He could not recall the bailiff's telling him that his wife worked with one of the potential jurors.

During cross-examination, trial counsel said that he could not "recall there being any variance" in the account of events provided by Mr. Frye and the defendant. He said that he told the Fryes that they could retain separate attorneys, but they nevertheless retained him to represent both of them. Trial counsel testified that, depending on "how long into the process it was," he would have entertained refunding a part of the retainer if one of the Fryes had opted to hire another attorney. He said that he would not have undertaken the joint representation if the Fryes had expressed any discomfort with the arrangement. He added, "We went through that, and I made sure they understood it." He said that he did not, at any point, force them into joint representation or even joint trials for that matter. Trial counsel said that the original trial judge went through the waiver with the Fryes twice, "[o]n two different court dates" in open court.

Trial counsel testified that he told Mr. Frye that the decision whether to testify "was up to him. That's his . . . right." He recalled that Mr. Frye elected not to testify while the defendant elected to testify. He said that he advised the defendant that he "didn't think the tape would . . . help her because she sounded very erratic in it. She was loud. I didn't think the jury would like it at all. I thought it hurt her case. And I advised her that she should testify about the case in her own words."

Trial counsel, upon examining the photograph of the defendant, said that he could not "really tell" that it depicted any injury. He recalled the defendant's "pointing it out" and that she "was pretty adamant about it." He reiterated that he "did not . . . believe [it] would be helpful. I didn't think it would bolster her story." He said that the photograph was inconsistent with the defendant's testimony that she had red marks all over her.

Trial counsel said that he did not "think I had a good-faith basis to" move for a change of venue. With regard to the defendant's complaint that trial counsel had not complied with the Fryes' request to be present during every meeting he had with the district attorney about the case, he said that in the "[t]welve (12) years I've been practicing, I've never done it once. The only time you ever do that is after it in a debriefing." He said that it was "definitely my experience" that prosecutors "don't want to do that." He added, "Matter of fact, I would sound like I didn't know what I was talking about if I offered that. I'd probably lose respect in the plea negotiation conversation." Trial counsel said that the district attorney's office never moved to have the Frye children removed from the courtroom.

During redirect examination, trial counsel testified that he advised the defendant to testify because she "was the one who could testify about the hands being put

on her," but he advised Mr. Frye not to testify because "I didn't think they had anything on him." Trial counsel said that he "thought [Mr. Frye] was winning. I didn't think there was any reason why he needed to testify" but that the defendant "had problems and she needed to explain it." He specifically denied the defendant's telling him that she only wanted to testify if it was for the purpose of introducing the recording. He said that he provided the recording to the State because he "wasn't going to close the door on" offering it into evidence. Trial counsel said that he attempted to negotiate a dismissal of the case but that, "[a]s in many cases you try to negotiate a dismissal, it failed." His "backup plan was to negotiate a Class B misdemeanor," but that was also unsuccessful. He acknowledged that he attempted to use the photograph and audio recording to help him negotiate. Regarding the decision not to offer either at trial, he said, "[T]he bottom line is, I didn't think, when we went to trial, that her behavior on that . . . recording, or him, was going to help them out at all, in my opinion."

Trial counsel, after reviewing an email from the defendant, said that although the defendant had originally indicated that she only wanted to testify as a means to introduce the audio recording, things changed on the first day of trial. He said that he and his associate spoke to the Fryes outside the courthouse and expressed

> the reasons why we did not think that evidence was good evidence for her. We explained to her that her behavior and her husband's behavior in that audio recording was erratic. That it was damaging. The sound of the voice, that we d[id] not believe . . . the jury would like it. And that she'd be better off testifying herself in a calm, reflective manner.
>
> And we all agreed and that's what we did.

Trial counsel had no specific recollections about the removal of the children from the courtroom. He said that "[a]t the time I thought about it, I . . . was more concerned about what was going on in my head, preparation for trial." He added, "I thought the least of the worries was the kids sitting in there, looking. And so I didn't think much about it."

The bailiff, Officer Gott, testified that although he remembered the trial, he did not "remember anything about the kids." He could not recall the children's being disruptive or asking trial counsel to have the children removed from the courtroom. He said that, although he could not recall even having seen the children, if he told trial counsel to have them removed, "they was probably doing something where I would have asked them to leave." He said that the district attorney's office had "never asked me to do something like that."

The trial court specifically found Mr. Frye's "testimony not to be credible. He even -- at one point he was asked about did [the defendant] testify truthfully, and . . . he hesitated." The court described the trial as a "fairly straightforward" "'he said/she said' type of trial" and that the "jury chose basically not to believe" the defendant. As to the audio recording, the court said that it could "understand [trial counsel's] reservations. It sounds [like] a lot of hysteria from . . . the recording . . . we heard." The court stated that it had viewed the photograph and that "they don't bear out" the defendant's claims about Deputy Hill's "roughing her up, throwing her down the stairs." The court found trial counsel's "testimony to be very credible, very truthful" and concluded that trial counsel did "a very competent job of . . . representing . . . the Fryes at trial." The court reiterated that trial counsel's "testimony was credible; Mr. Frye's testimony was anything but."

Before relief will be granted based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762,

766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001); *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

### A. Conflict of Interests

The defendant contends that trial counsel should not have agreed to represent both her and Mr. Frye and that his doing so resulted in an actual conflict of interests that resulted in a denial of her right to counsel. The State contends that the Fryes, having been duly warned about the potential for a conflict of interests, waived it both in writing and in open court.

The record establishes that trial counsel appeared with the Fryes at their arraignment in May 2016 and advised the court that he had "explained to them about any potential conflict." He also assured the court that he had "looked at the case" and that "in my professional opinion, there's no potential for conflict." Trial counsel indicated that the Fryes had signed a waiver. At that point, the trial court allowed the case to proceed. At a status hearing on July 13, 2016, the trial court mentioned the issue again, specifically noting that the Fryes had executed written waivers of the potential conflict of interests. After some discussion, the trial court advised trial counsel to have the Fryes execute new waivers. At a November 3, 2016 status hearing, the court revisited the issue and actually questioned the Fryes in open court about the conflict of interests. After Mr. Frye indicated that he did not "completely understand" the issue, the trial judge permitted trial counsel and the Fryes to use his office to discuss the issue for at least the third time. When they returned to court, trial counsel indicated that he had "gone over the conflict. We have done this before." He stated that the Fryes understood and only needed to sign another affidavit indicating their consent to proceed with joint representation. The trial court then questioned the Fryes:

> THE COURT: Okay. Now, have you -- during the recess have you talked with your attorney?
>
> DEFENDANT KELLY FRYE: Yes.
>
> DEFENDANT ANDY FRYE: Yes.
>
> DEFENDANT KELLY FRYE: Yes.
>
> THE COURT: And have you understood what he means by "*conflict*"?

DEFENDANT KELLY FRYE:     Yes.

DEFENDANT ANDY FRYE:     Yes.

THE COURT:     And you understand that I would never force anybody to trial . . . that has the potentiality of a conflict.

Previously today you've assured me that you see no conflict in your different positions. But that would cut out if the State. . . .

Much -- many of our cases resolve in negotiation. And sometimes the State may offer one defendant a different sentence or may not. But that's always a possibility. That would preclude [trial counsel] from staying on your case.

. . . .

THE COURT:     Now, also there could be conflicts in your defenses. You've assured me there's not.

DEFENDANT KELLY FRYE:     Correct.

THE COURT:     But, and under the law, under *Parrott*, the appellate case, you all can sign a waiver of conflict if you want to be tried with the same lawyer. And at this point that's what I've been advised of.

Now, [trial counsel] will have to refile the waiver.

. . . .

THE COURT:     But if . . . there's a potentiality of conflict --

[TRIAL COUNSEL]:     There's not.

THE COURT:     --they're waiving any conflict.

-38-

[TRIAL COUNSEL]:     Right.     And  I  .  .  .
understand, Your Honor. I wouldn't . . . take on a case like this
if I thought there was going to be any conflict whatsoever. So,
I wouldn't get [the defendant] in that mess.

Signed waivers were later entered into the record.

Tennessee Supreme Court Rule 8 provides, in pertinent part, that

A lawyer shall not represent more than one client in the same
criminal case or juvenile delinquency proceeding, unless:

(1) the lawyer demonstrates to the tribunal that good cause
exists to believe that no conflict of interest prohibited under
this Rule presently exists or is likely to exist; and

(2) each affected client gives informed consent.

Tenn. R. Sup. Ct. 8, RPC 1.7(c). "The court shall promptly inquire about the propriety of
joint representation and shall personally advise each defendant of the right to the effective
assistance of counsel, including separate representation." Tenn. R. Crim. P. 44(d). That
being said, "[t]he mere fact of joint representation will not, in and of itself, be sufficient to
show an actual conflict, nor will hypothesis or speculation." *State v. Parrott*, 919 S.W.2d
60, 61 (Tenn. Crim. App. 1995) (citation omitted). Importantly, jointly represented
defendants may waive the right to conflict-free counsel. *See Wheat v. United States*, 486
U.S. 153, 160 (1988).

Prejudice will only be presumed in those cases where the defendant has
established that trial counsel "'actively represented conflicting interests' and that 'an actual
conflict of interest adversely affected [the] lawyer's performance.'" *Strickland*, 466 U.S.
at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350 (1980)). As the Court explained,

[I]t is difficult to measure the precise effect on the defense of
representation corrupted by conflicting interests. Given the
obligation of counsel to avoid conflicts of interest and the
ability of trial courts to make early inquiry in certain situations
likely to give rise to conflicts, it is reasonable for the criminal
justice system to maintain a fairly rigid rule of presumed
prejudice for conflicts of interest.

-39-

*Id.* (citation omitted). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000)). "The proper focus is solely upon whether counsel's conflict affected counsel's actions . . . ." *Netters v. State*, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997).

The record establishes without any doubt that the defendant waived any potential conflict of interests occasioned by trial counsel's jointly representing her and Mr. Frye. The trial court deemed Mr. Frye's testimony, including his claim that he did not understand what he was doing when he executed the waiver, completely lacking in credibility. The defendant did not testify at the hearing on the motion for new trial, so we cannot speculate what her testimony would have been on this issue. Thus, we are left with her answers in open court that she had been advised of the potential for a conflict of interests, that her position was identical to that of Mr. Frye, and that, as a result, she had decided to waive any potential conflict of interests. Under these circumstances, she is not entitled to relief. Similarly, given the defendant's explicit waiver on the record, as well as trial counsel's accredited testimony that he had advised the Fryes on this issue multiple times, the defendant's claims about the content of the actual written waivers cannot avail her of any relief. Finally, that trial counsel advised the defendant to testify but advised Mr. Frye not to testify does not suggest any actual conflict of interests sufficient to overcome the waiver in this case. If anything, the differing advice suggests that trial counsel was, as the defendant wanted, treating the two defendants "separately."

### B. Public Trial

The defendant claims that trial counsel failed to protect her right to a public trial by failing to advise her about her right to a public trial and by failing to request a hearing on the removal of her children from the courtroom. The State correctly points out that the defendant, who did not testify at the hearing on the motion for new trial, presented no evidence in support of her claim that trial counsel failed to advise her of the right to a public trial. Counsel did testify that he did not request a hearing on the children's removal from the courtroom, noting that the children's presence or lack thereof was "the least of our concern."

The Supreme Court has stated that counsel's "failure to object to a public-trial violation" does not always "deprive[] the defendant of a reasonable probability of a different outcome." *Weaver*, 137 S. Ct. at 1911.

> Thus, when a defendant raises a public-trial violation via an
> ineffective-assistance-of-counsel claim, *Strickland* prejudice is

not shown automatically. Instead, the burden is on the defendant to show either a reasonable probability of a different outcome in his or her case or . . . to show that the particular public-trial violation was so serious as to render his or her trial fundamentally unfair.

*Id.*

As indicated above, although the record does not establish exactly how the children came to be removed from the courtroom, it does establish that no action of the State was involved. To be sure, the State did not ask the trial court to close the courtroom or remove any particular person, including either of the defendant's young children. The trial court did not order the children to be removed. This is not a situation like that presented in *Waller v. Georgia*, when the trial court closed the courtroom, thereby totally excluding the public, during the suppression hearing, *see Waller*, 467 U.S. at 48, or *State v. Franklin*, when the trial court closed the courtroom during the testimony of the minor victim, thereby excluding the defendant's family, *see State v. Franklin*, 585 S.W.3d 431, 464-74 (Tenn. Crim. App. 2019). Because the record does not reflect that the defendant's right to a public trial was denied, she cannot establish that trial counsel performed deficiently by failing to adequately protect her right to a public trial.

## C. Adversarial Testing

Next, in an attempt to avoid her duty to establish that trial counsel's actions or inactions prejudiced her case, the defendant claims that trial counsel failed to subject the State's case to adversarial testing and that, accordingly, this court should presume prejudice. In support of her argument, the defendant asserts that trial counsel failed to request a bill of particulars, failed to seek a change of venue, failed to introduce the audio recording and photograph, failed to interview witnesses, and failed to cross-examine Lieutenant Lane.

A reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or under circumstances of such magnitude that no attorney could provide effective assistance. *United States v. Cronic*, 466 U.S. 648, 658-60 (1984). None of the defendant's claims supports a conclusion that trial counsel completely failed to subject the State's case to adversarial testing. The record in this case clearly establishes that trial counsel negotiated with the State prior to trial, cross-examined most of the witnesses presented by the State, made objections, called witnesses on the defendant's behalf, and made a compelling closing argument.

-41-

Moreover, when examined under the appropriate standard set forth in *Strickland*, it is clear that none of the defendant's claims entitle her to relief.

### D.  Bill of Particulars

Trial counsel testified that he did not ask for a bill of particulars because he did not need one given that the case was clear and straightforward.[5]  Tennessee Rule of Criminal Procedure 7(c) provides that "[o]n a defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged."  Tenn. R. Crim. P. 7(e).  "The purpose of the bill of particulars is to provide information about the details of the charge when necessary for a defendant to prepare his or her defense, to avoid prejudicial surprise at trial, and to enable the defendant to preserve a plea of double jeopardy."  *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997); *see also State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *State v. Shropshire*, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000).  "Information that may be required in the bill of particulars includes, but is not limited to, details as to the nature, time, date, or location of the offense."  *Speck*, 944 S.W.2d at 600 (citing *Byrd*, 820 S.W.2d at 741-42).

Here, the presentment charged the defendant with a single count of making a false report on August 13, 2015.  The defendant did not testify at the hearing on the motion for new trial, so we have no means of determining whether she was surprised by the testimony of any of the witnesses at trial.  No evidence suggested that the defense was hampered by the absence of the bill of particulars.  Indeed, trial counsel's accredited testimony established that he was prepared to go to trial.  Nothing suggests that the presentment was insufficient to protect the defendant from double jeopardy.  Because the defendant failed to establish what, if any, benefit she could have gained from a bill of particulars, she has failed to show that trial counsel performed deficiently by failing to request a bill of particulars.  *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999) ("For purposes of proving an ineffective assistance of counsel claim, proof of deficient representation by omission requires more than a speculative showing of a lost potential benefit.").

### E.  Venue

Trial counsel said that he did not move for a change of venue because he did not believe that the circumstances warranted it, and the defendant presented no evidence at all to suggest that a motion for change of venue would have been meritorious.  The

---

[5]  We agree with trial counsel's assessment that, despite this case's having been litigated for more than five years, it is, in reality, a simple and straightforward case.

Tennessee constitution provides that "in all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the County in which the crime shall have been committed." Tenn. Const. art. 1, § 9; *see also* Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). Despite this general rule, the rules of criminal procedure permit the trial court to "order a venue change when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). When considering such a request, the trial court should "consider a number of factors, including the nature and extent of pre-trial publicity, the degree of publicity in the area from which the venire will be drawn, the existence of hostility or demonstrations against the defendant, and the length of time between the pre-trial publicity and the trial." *State v. Davidson*, 121 S.W.3d 600, 611 (Tenn. 2003) (citing *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979)).

The decision to grant the defendant's motion for a change of venue rests soundly within the discretion of the trial court, and this court will not overturn the trial court's decision absent a "clear" abuse of that discretion. *Davidson*, 121 S.W.3d at 611-12 (citing *State v. Dellinger*, 79 S.W.3d 458, 481 (Tenn. 2002)). "Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id.* at 612 (quoting *Dellinger*, 79 S.W.3d at 481); *see also State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *State v. Melson*, 638 S.W.2d 342, 361 (Tenn. 1982).

The trial record is utterly devoid of any evidence of *pretrial* publicity surrounding the defendant's case. The defendant appended to her appellate brief a single article, published after the defendant's trial, that simply reported the results of the trial and the fact that the conviction ended the defendant's bid as an independent candidate for mayor. We remind the defendant that items appended to an appellate brief but not made a part of the record cannot be considered by this court. *See State v. Matthews*, 805 S.W.2d 776, 783-84 (Tenn. Crim. App. 1990) ("Rule 28, Tennessee Rules of Appellate Procedure, does not contemplate attaching a transcript of proceedings to a brief when the transcript has not been made a part of the record."); *see also James Dubose v. Tony Parker, Warden and State of Tennessee*, W2005-01320-CCA-R3-HC, slip op. at 5 ("[D]ocuments attached to appellate briefs but not certified into the record cannot be considered as part of the record on appeal.").[6] Even if we could consider the article as evidence, it would not avail her of the relief she desires. Furthermore, as stated in our discussion of juror bias, the defendant presented no evidence that the jury that ultimately heard her case was biased or prejudiced

---

[6]     Indeed, the defendant either appended to her brief or forwarded to this court any number of items not certified as part of the trial record and not considered by the trial court in making any of its rulings.

in any way.  In consequence, she has failed to establish that, had trial counsel moved for a change of venue, the result of the proceeding would have been different.

## *F.  Admission of Evidence*

The defendant asserts that trial counsel performed deficiently by failing to offer into evidence the audio recording captured by Mr. Frye that purportedly captured the interaction with Deputy Hill and the photograph purportedly taken of the defendant following the incident.  Trial counsel testified that he did not attempt to introduce either the audio recording or the photograph because he did not believe that either would have been beneficial to the defendant's case.  The trial court agreed that the audio recording would have been far more likely to damage the defendant's case than to exonerate her.  Although the defendant played a short clip of the recording at the hearing on her motion for new trial, she did not move the recording into evidence, so it was not properly included in the record on appeal.[7]  Nevertheless, we conclude, based upon trial counsel's accredited testimony, that his decision not to offer the audio recording qualifies as a reasonable strategic decision.  Similarly, the photograph, which was exhibited to Mr. Frye's testimony, does not, as the defendant contends, support her trial testimony that Deputy Hill "manhandled" her or threw her around.  If anything, the photograph bolsters Officer Horne's testimony that the defendant had no visible injuries at the time she made the complaint against Deputy Hill.

The defendant also asserts that trial counsel performed deficiently by failing to cross-examine Lieutenant Lane.  However, the record does not establish that, even if trial counsel had successfully excluded the entirety of Lieutenant Lane's testimony, the result of the proceeding would have been different.  Even without Lieutenant Lane's testimony, the evidence was more than sufficient to support the defendant's conviction.  In consequence, she is not entitled to relief on this issue.

The defendant complains generally that trial counsel performed deficiently by failing to interview and subpoena any of the witnesses, including Officer Matt McGuire, that they suggested to him.  The defendant cannot establish entitlement to relief on this ground, however, because she failed to present any of these witnesses at the hearing.  Generally, a defendant fails to establish her claim that counsel performed deficiently by failing to call a witness if she does not present the witness to the trial court because a court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial.  *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the

---

[7]        This is one of the items that the defendant attempted to forward to this court for our consideration.

evidentiary hearing.").[8]  Consequently, the defendant cannot show that counsel performed deficiently by declining to present certain witnesses or evidence at trial.

## *VI.  Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

---

[8]     Here, again, the defendant's supplementing the record with the statement that Officer McGuire provided during the investigation into the defendant's claim that Deputy Hill assaulted her does not relieve her of her burden to present Officer McGuire as a witness at the hearing.  The statement is hearsay, was not considered by the trial court, and was not properly included in the record on appeal.  Moreover, as the State noted at the hearing, any evidence that Officer McGuire had permitted the Fryes to leave was irrelevant to the issue whether the defendant falsely reported that Deputy Hill assaulted her.